OPINION OF THE COURT
Diane A. Lebedeff, J.
The parties, once engaged, sue and countersue on issues which arise from the termination of their engagement. The disputes concern the wedding preparation expenses, the engagement ring, third-party gifts and the premarital transfer of a one-half interest in the real property which was to be the *76 marital abode.[1] The distinguishing feature of this case — that both parties were well-established professional adults who embarked upon preparations for a formal wedding paid for from their own funds, primarily acting upon clear plans regarding their engagement and the establishment of their eventual economic union — calls for application of contract-based theories to the maximum extent possible, a legally novel approach, but one particularly suited to couples of this type and to contemporary society.
Briefly, the plaintiff is a female nurse practitioner and the defendant is a male attorney with two prior marriages, each of which concluded in divorce. The parties became engaged in 2000. They planned a wedding in St. Patrick’s Cathedral and a reception at the United Nations Plaza Hotel and registered their gift lists at suitably luxurious merchant establishments. He purchased an expensive engagement ring at Tiffany & Co. It is undisputed that the couple agreed the female plaintiff would pay the wedding-related expenses and that, prior to the marriage, the male defendant would provide her with a one-half interest in a residence. The defendant transferred to plaintiff a one-half interest in the condominium apartment which he owned free and clear. In March of 2001, the engagement terminated in a flurry of heated actions, which are relevant only to the extent described below. In April of 2001, each party sued the other to seek a resolution of the issues remaining open between them.
Resolution of the economic aspects of the dissolution of an engagement starts with section 80-a of the Civil Rights Law, which was enacted in 1935 and abolished suit for breach of contract to marry, and section 80-b of the Civil Rights Law, which was enacted in 1965 and permits, but does not require, *77 a court to direct return of gifts given solely in contemplation of a marriage which did not occur. The history and interpretation of these New York statutes were fully explored in Gaden v Gaden (29 NY2d 80, 88 [1971]).[2]
The Diamond Engagement Ring
The court starts with application of the traditional principle of New York law holding that an engagement ring is the property of the male donor when an engagement is terminated (see, Gagliardo v Clemente, 180 AD2d 551 [1st Dept 1992]; Scheinkman, New York Law of Domestic Relations, Courtship: Engagement Rings, § 4:4, at 105 [West NY Practice Series 2002] [“Even prior to the enactment of the anti-heart balm legislation,” cases held that “(t)he donee of the ring receives, at the time of the gift, only the right of possession. Firm ownership passes only upon the performance of the marriage”]).
This rule applies only to a ring given as an engagement ring (id. at 106 [“If there were reasons other than a contemplated marriage why the gift was given, such as part of a birthday or holiday celebration, the ring may not be subject to return. Where there is a genuine dispute as to the circumstances under which the ring was given, a trial is necessary to determine the facts”]). Here, although Ms. DeFina stated that Mr. Scott later described the ring as a Valentine’s Day gift, the ring remained covered by his homeowner’s policy with Ms. DeFina’s explicit consent.[3] Based upon the record as a whole, the court finds the parties agreed that the ring remained his property and no exception to the engagement ring rule is applicable.
*78 The ring vanished from Ms. DeFina’s lower Manhattan apartment shortly after the events of September 11, 2001, and Mr. Scott has been paid for its loss by his insurance company. The only determination necessary to resolve this item is a declaration that Mr. Scott may retain the insurance proceeds as his property.
Wedding Expenses and The Apartment
Ms. DeFina testified without contradiction that she and Mr. Scott agreed that, as self-supporting professionals, each would contribute toward their impending marital status by Ms. DeFina advancing wedding preparation expenses and Mr. Scott conveying to her a joint interest in his condominium apartment. The court heard the testimony of these two strong-willed, strong-minded, highly-educated, and sophisticated adults and is fully satisfied that this agreement was reached between them, likely after some hard bargaining, and that both performed pursuant to this agreement.[4]
Mr. Scott urges that, in addition to securing the value of the engagement ring, he should be restored to full ownership of his unit, and that Ms. DeFina should be left bearing the approximately $16,000 outlay for the canceled wedding.[5] Commentators have examined this proffered scenario and have *79 concluded that women, who traditionally bear wedding expenses, are necessarily the economic losers in broken engagements. For example, Rebecca Tushnet in Rules of Engagement (107 Yale LJ 2583, 2618 [1998]), after an extensive review of applicable laws, concluded, “The shift to mandatory ring-return rules and the denial of women’s claims for restitution [for advanced wedding expenses] have combined to make premarital law unfavorable to women. Until courts and legislatures elaborate a better theory of what no-fault rules are supposed to accomplish, this regime will remain both unequal and unjustified.”
Ms. DeFina requests reimbursement on the basis of upholding a simple contract agreed to between the parties: that Mr. Scott agreed to give Ms. DeFina a half interest in his condominium, and her outlays were to be her contribution thereto. She may not retain the entire interest, for there was no separate and independent business basis for the transfer (see, Vasinkevich v Elm Drugs, 208 AD2d 522 [2d Dept 1994] [premarital transfer involved shareholder’s agreement, guarantee and other consideration and was not affected by dissolution of engagement]).
Under settled principles of New York law, a contribution to a premarital gift entitles the contributor not to the retention of the entire gift but to a lien against the asset to the extent of the contribution (Gaden v Gaden, supra', see, Hendrick v Tellier, 274 AD2d 944 [4th Dept 2000] [improvements to real property belonging to former fiancée support claim for lien, unjust enrichment and constructive trust]). Because this principle invokes the lien exception relating to recovery of gifts made in contemplation of marriage (Civil Rights Law § 80-b),[6] **6 such a result does not fall within the prohibited cause of action of breach of a contract to marry (Civil Rights Law § 80-a), even *80 though wedding preparation expenses are a typical element of damages in an action for breach of contract to marry where such claims are recognized (see, J.P. Ludington, Measure and Elements of Damages for Breach of Contract to Marry, 73 ALR2d 553 [I960]).
The court finds no cognizable rationale for treating a contract regarding wedding expenses as significantly different from any other contract. As specifically relevant to couples, the law has advanced to the extent that prenuptial and antenuptial agreements are freely recognized (Bloomfield v Bloomfield, 97 NY2d 188, 193 [2001] [“Duly executed prenuptial agreements are accorded the same presumption of legality as any other contract” and “there is a ‘strong public policy favoring individuals ordering and deciding their own interests through contractual arrangements’ ”], quoting Matter of Greiff, 92 NY2d 341, 344 [1998]). Even domestic partners may call upon a court to resolve and regulate property rights acquired during their relationship (Minieri v Knittel, 188 Misc 2d 298 [Sup Ct, NY County 2001] [action for reformation of title documents to real property and other assets upon dissolution of lesbian relationship]). When both married and unmarried couples may call upon courts for enforcement of contracts, the agreements of formerly betrothed couples surely should be accorded the same honor.
Further, where a contract exists, a contractual approach is refreshingly simple and entirely consistent with New York law. Courts may continue to follow the dictate that they not consider “tales of broken hearts and frustrated dreams” (Gaden v Gaden, supra, 29 NY2d at 89). Courts need not weigh what New York has specifically cast aside as a factor — who was at fault in a broken engagement — which necessarily would be explored under theories of deceit or promissory estoppel advanced by commentators (see, inviting application of such theories to right the economic balance regarding wedding preparation expenses borne almost exclusively by women, Jeffrey D. Kobar, Heartbalm Statutes and Deceit Actions, 83 Mich L Rev 1770 [1985]; Neil G. Williams, What to Do When There’s No “1 Do”: A Model for Awarding Damages under Promissory Estoppel, supra). When considering the Court of Appeals’ direction that the formerly engaged are to be returned “to the position they were in prior to their becoming engaged, without rewarding or punishing either party for the fact that the marriage failed to materialize” (Gaden v Gaden, supra, 29 NY2d at 88), while the parties may never be made economically whole, surely the best *81 way to refrain from undue reward and punishment is to recognize the adult participants’ allocation of their own economic interests and risks.
As a final note, it is observed that Mr. Scott has advanced no argument or testimony which would support a finding that Ms. DeFina should be found entitled to only one half of her expenditures. The court is left with a record from which it can only hold that the parties themselves were satisfied that Ms. DeFina’s outlay on wedding preparation expenses was sufficient “contribution” for transfer of one half of the ownership interest in the condominium. Under the law, the court recognizes such expenditures as a lien.
The court accepts the contradicted and unimpeached testimony that Ms. DeFina expended $14,329.82 of her own funds to vendors and others, paid Mr. Scott for an $83.22 outlay, and reimbursed Mr. Scott for half the cost of his bachelor party ($1,273.50), giving rise to a lien of $15,686.54, with interest from the date of the last expense of June 9, 2001. Subject to such lien, Mr. Scott shall be restored to sole title of the apartment.
Third-Party Gifts
The next item of dispute involves gifts by third parties, which is a matter already treated under contract principles. A postengagement agreement regarding the division of engagement gifts is not seen as one made in contemplation of matrimony and not subject to the provisions of the Civil Rights Law (see, 45 NY Jur 2d, Domestic Relations § 340 [“Recovery of property transferred in contemplation of marriage”] [2002] [“Even prior to enactment of the foregoing provision of the Civil Rights Law, it was held that if, after a mutual termination of the contract to marry, the parties entered into a new and separate agreement to return gifts made in contemplation of the marriage, such agreement would not be construed as falling within the bar of actions for breach of a contract to marry, and a recovery could be had thereon”]; see also, Costas v Marmarellis, 200 Misc 912 [App Term, 2d Dept 1951] [third party permitted to sue to recover gifts]).
Ms. DeFina testified, without contradiction, that after the dissolution of the engagement, she and Mr. Scott (1) agreed to return the engagement gifts received to their respective donors, (2) that she returned all gifts in her possession, and (3) Mr. Scott failed to return five engagement gifts and retained possession of them. Consideration is present in that Ms. DeFina *82 returned objects of value to other donees. There being no dispute that these gifts were given to them as a couple, Ms. DeFina is found to have an interest in these objects of personal property.
As to valuation, the market value of one item was given as $100 and the remaining four gifts were of a luxury character (id., a Tiffany crystal pitcher, Louis Roderer champagne, a 16-bottle case of wine, and a coffee/cappuccino maker). The court accepts the testimony of Ms. DeFina as to the one valuation and sets an equivalent value of $100 on each additional item. The court recognizes that damages “may be measured in different ways” (Fisher v Qualico Contr. Corp., 98 NY2d 534, 539 [2002]; see also, 36 NY Jur 2d, Damages § 83 [“Property which has no market value”] [2002] [“The absence of market value for an item of personal property damaged by another does not restrict the owner to nominal damages; recourse may then be had to some other rational method of ascertaining the value of the property from such elements as are attainable. A wrongdoer may not escape liability simply because there is no market value, or none of the ordinary standards, for measuring the damages”]).
In this case, market value of such personal property measured immediately before the loss would be a relevant measure of damages (Lozinsky v Neubauer Servicenter, 259 AD2d 673 [2d Dept 1999]), and for an unused and virtually new item, market value is equivalent to the purchase price (Jaklitsch v Finnerty, 96 AD2d 690, 692 [3d Dept 1983]). Value may not be increased for sentimental or fanciful attachment (Lake v Dye, 232 NY 209, 214 [1921]; Kennedy v McKesson Co., 58 NY2d 500, 507 [1983]).
The court here utilizes a “practical means that will be just” (Dinicu v Groff Studios Corp., 257 AD2d 218, 224 [1st Dept 1999]), considering the character of each item as an engagement gift of value and usefulness and other “circumstances and conditions” apparent from the record (Lake v Dye, supra, 232 NY at 214). Given a valuation of $500 for the total of the five gifts, conversion damages for the wrongful retention of Ms. DeFina’s one-half interest in these five objects is set at $250 (see, Murnane v Albisano, 2002 NY Slip Op 40297[U] [App Term, 2d Dept 2002] [claimant entitled to one half of cash gifts given to them as a couple by third parties]).
Other Claims
No evidence was introduced in relation to Mr. Scott’s claim for abuse of process, nor was there sufficient evidence of slander *83 or defamation. As to the respective requests for legal fees, no reason has been shown for departure from the American rule that a party may not “recover damages for the amounts expended in the successful prosecution or defense of its rights” (Mighty Midgets v Centennial Ins. Co., 47 NY2d 12, 21-22 [1979]). For these reasons, such claims are severed and dismissed.
Ms. DeFina has also interposed a claim of intentional infliction of emotional distress, premised upon the fact that Mr. Scott’s actions led to her confinement for observation. In concise terms, Ms. DeFina became quite upset when the relationship began to terminate, which is a description supported by the evidence. Mr. Scott called the police and, shortly thereafter, a large number of police and emergency medical personnel arrived at her apartment and took her to Bellevue Hospital. The emergency medical personnel and the doctors are not shown to have acted upon anything other than their own professional judgment and there was no expert evidence which would permit the court to determine that Mr. Scott’s actions were the proximate cause of any identifiable portion of her confinement (compare, Brown v Sears Roebuck & Co., 297 AD2d 205 [1st Dept 2002] [false arrest claim fails without showing false statements were reason for arrest]).
Given this want of evidence, even if it were accepted that Mr. Scott intentionally expended effort to cause Ms. DeFina to be confined for as long as possible by his repeated contacts with the medical personnel while failing to speak directly with Ms. DeFina to ascertain her then-current condition, the record is insufficient to support a finding of liability and this claim must fall. The court was deeply impressed that the medical record reveals that Ms. DeFina responded to this unexpected confinement by reining in her temper and calmly displaying self-control, composure and dignity.

. The matter was tried by the court following a stipulation waiving a jury. This court had its opportunity to “view the witnesses, hear the testimony and observe demeanor” (People v Bleakley, 69 NY2d 490, 495 [1987]; see also, Northern Westchester Professional Park Assoc. v Town of Bedford, 60 NY2d 492, 499 [1983]; Hoover v Durkee, 212 AD2d 839, 841 [3d Dept 1995]). Issues of credibility and the weight given to the evidence presented are determined by the court in a nonjury trial (People v Coleman, 278 AD2d 891 [4th Dept 2000], lv denied 96 NY2d 798 [2001]; see, as to appellate review, Matter of Caccavale v Brown, 271 AD2d 717, 718 [3d Dept 2000] [“deference will be accorded to (trial court) findings unless they lack a sound and substantial basis in the record”] [citations omitted], and People v Corporan, 169 AD2d 643 [1st Dept 1991], lv denied 77 NY2d 959 [1991] [credibility determinations “should not be disturbed unless manifestly erroneous and so plainly unjustified by the evidence that rejection is required in the interest of justice”]).

. The Court of Appeals stated that this statute made it “abundantly clear that a person, not under any impediment to marry” has a “right to recover property given in contemplation of a marriage which has not occurred” (id. at 85). On the other hand, “the statute specifically contemplates that the donee may contribute to some extent towards the gift in question” and, if such a contribution is made, the donee is entitled to “a lien to the extent of the contribution” (29 NY2d at 86). The parties are to be returned “to the position they were in prior to their becoming engaged, without rewarding or punishing either party for the fact that the marriage failed to materialize” (29 NY2d at 88).
In relation to the treatment of premarital gifts, fault in relation to the breaking of the engagement plays no part in the determination to be made (29 NY2d at 88 [“in one sense the engagement period has been successful if the engagement is broken since one of the parties has wisely utilized this time so as to avoid a marriage that in all probability would fail”]). (For an examination of a variety of cases involving premarital gifts, see, Joel S. Brandes, The Return of Engagement Gifts, NYLJ, Oct. 27, 1998, at 3, col 1.)

. By a quirk of fate, this decision is also issued on Valentine’s Day.

. Mr. Scott did convey to Ms. DeFina a one-half interest in his apartment, which he owned free and clear, well before the wedding and before her outlays were completed.
It is noted that the original agreement was that Mr. Scott would sell his apartment and purchase another abode from the proceeds, which new abode would be their marital residence. His apartment was put on the market and, after a decision was made to retain the unit and it was taken off the market, he transferred a half interest in the condominium to Ms. DeFina by quitclaim deed on February 28, 2001, more than four months before the scheduled wedding. The conveyance cannot be described as an emotional act of a love-blinded swain for Mr. Scott, a twice-divorced lawyer, had reason to know that the condominium otherwise would have been his separate property even after marriage.
Ms. DeFina had a separate abode during the entire relevant period of time.

. This figure is a fairly typical expenditure for weddings (Neil G. Williams, What to Do When There’s No “I Do”: A Model for Awarding Damages under Promissory Estoppel, 70 Wash L Rev 1019, 1059-1060 [1995] [advances for wedding expenses include “rings, wedding announcements, facilities rental charges, priests, ministers or rabbis, bridal gowns, photographers, florists, caterers, and musicians,” and “expenditures on the average wedding in this country total more than $15,000”]; see also, Bruno v Guerra, 146 Misc 2d 206 [Sup Ct, NY County 1990, Tompkins, J.] [$28,000 expended by parents on wedding preparation not recoverable and unjust enrichment did not lie because there was no economic benefit given to defendant who terminated engagement the night before the wedding]; see also, Griffin-Amiel *79 v Orchestras, 178 Miscc 2d 71 [Yonkers City Ct 1998, Dickerson, J.] [collecting cases involving the defective provision of services and goods marring wedding ceremonies]).

. Section 80-b of the Civil Rights Law provides as follows: “Nothing in this article contained shall be construed to bar a right of action for the recovery of a chattel, the return of money or securities, or the value thereof at the time of such transfer, or the rescission of a deed to real property when the sole consideration for the transfer of the chattel, money or securities or real property was a contemplated marriage which has not occurred, and the court may, if in its discretion justice so requires, (1) award the defendant a lien upon the chattel, securities or real property for monies expended in connection therewith or improvements made thereto, (2) deny judgment for the recovery of the chattel or securities or for rescission of the deed and award money damages in lieu thereof.”